411 F.2d 147
 71 L.R.R.M. (BNA) 2243
 AMERICAN BREAD COMPANY, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, and Teamsters,
Chauffeurs, Helpers and Taxicab Drivers Local 327,
Affiliated with International Brotherhood of Teamsters,
Chauffeurs, Warehousemen and Helpers of America; and
American Bakery and Confectionery Workers' International
Union, AFL-CIO, Intervenors.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
TEAMSTERS, CHAUFFEURS, HELPERS AND TAXICAB DRIVERS LOCAL
327, Affiliated with International Brotherhood of
Teamsters, Chauffeurs, Warehousemen and
Helpers of America, Respondent.
AMERICAN BREAD COMPANY, Petitioner, and American Bakery &
Confectionery Workers' International Union,
AFL-CIO, Intervenor,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 Nos. 18566, 18650, 18567.
 United States Court of Appeals Sixth Circuit.
 May 14, 1969.
 
 Charles Hampton White, Nashville, Tenn., Gullett, Steele, Sanford & White, Nashville, Tenn., on brief, for American Bread Co.
 Gary Green, N.L.R.B., Washington, D.C., Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Gary Green, Robert A. Giannasi, Attys., N.L.R.B., Washington, D.C., on brief for N.L.R.B.
 Hugh C. Howser, Nashville, Tenn., Barrett, Creswell & Mitchell, George E. Barrett, Nashville, Tenn., Larry Helm Spalding, Nashville, Tenn., on brief, for Teamsters, Chauffeurs, Helpers, etc.
 George B. Driesen, Washington, D.C., Van Arkel & Kaiser, Henry Kaiser, Ronald Rosenberg, Washington, D.C., Adair, Goldthwaite, Stanford, Daniel & Horn, William A. McHugh, Jr., Atlanta, Ga., on brief, for American Bakery & Confectionery Workers.
 Before O'SULLIVAN, CELEBREZZE and COMBS, Circuit Judges.
 CELEBREZZE, Circuit Judge.
 
 
 1
 This appeal relates to two National Labor Relations Board decisions concerning the American Bread Company, Teamsters, Chauffeurs, Helpers and Taxicab Drivers Local 327 (hereinafter Teamsters), and the American Bakery and Confectionary Workers' International Union (hereinafter ABC).
 
 
 2
 The complex factual situation and litigational background are fully set forth in the decisions of the Board and the reports of the Trial Examiner.[1] Those facts necessary to an understanding of the questions involved may be stated as follows:
 
 Nos. 18,566-18,650
 
 3
 American Bread Company is engaged in the baking, sale and distribution of bread and other bakery products. It employs transport drivers, route salesmen, and production and maintenance workers. The seven transport drivers haul bakery products from Nashville, Tennessee to fifteen warehouses located throughout Tennessee and nearby Kentucky. Once the products reach the warehouses, the driver-salesmen take over and handle the local distribution. In addition to maintenance and production workers, the Company employs thrift store workers, warehouse keepers and some part-time help.
 
 
 4
 In April of 1965 the Teamsters sought recognition as the bargaining agent for the route salesmen and the production and maintenance workers, but the Company, doubting the majority, refused recognition. Finally, after the Company's refusal of a card check, a strike resulted. The Teamsters filed a charge with the N.L.R.B. concerning the Company's refusal to bargain; but the record is incomplete as to its disposition. The Company filed unfair labor practice charges against the Teamsters, alleging violations of Section 8(b)(1) and (7) (C) of the National Labor Relations Act (hereinafter Act), 29 U.S.C. 158(b)(1) and (7)(C). At the same time the Company petitioned for a representative election. On May 21, 1965 the Regional Director refused issuance of a complaint against the Teamsters, but did direct an expedited election.
 
 
 5
 The Teamsters objected to the election, demanded a hearing pursuant to Section 102.77(b) of the Board's Rules and Regulations, 29 C.F.R. 102.77(b) and later requested the Board to stay the election. The Board denied numerous Teamster requests to stay the election, but stated that the unit could be challenged by filing objections to conduct affecting the results of the election. Although no such objections were filed, the Teamsters did challenge a substantial number of the ballots cast in the May 28, 1965 election.
 
 
 6
 The Teamsters continued picketing of the American Bread Company after the expedited election, but did alter the wording on their placards.[2] On July 1, 1965 the Teamsters started picketing at E. I. du Pont, Shoney's Big Boy Restaurant and the Flaming Steer Restaurant. The signs used there read something to the effect of: 'To the Customer. Sunbeam Bread is sold here. Local 327.' In these three establishments Sunbeam Bread was used to make sandwiches and toast and also in cooking, but was not sold separately on a retail basis.
 
 
 7
 In early July, the Regional Director issued a report overruling the Teamsters' challenges to the ballots. However, the Regional Director reopened the case and permitted the Teamsters to submit evidence by treating the Teamsters' request for an appeal as a motion for reconsideration. On July 16, 1965, the Regional Director filed a Supplemental Report permitting the ballots to be opened and counted. The Teamsters then requested special permission to appeal the Supplemental Report and sought to stay the Regional Director from certifying the results. These requests were denied and the election results were certified.[3]
 
 
 8
 The Teamsters continued to picket American Bread after certification of the election on the theory that the results were contrary to legal precedent. In July and August the Company filed charges which resulted in the Regional Directer issuing a complaint and charging the Teamsters with violations of Section 8(b)(4)(i) and (ii)(B) and Section 8(b)(7)(B) of the Act.
 
 
 9
 On December 7, 1965 a consolidated hearing was held concerning National Labor Relations Board cases Nos. 26-CC-94 and 26-CP-19.[4] Counsel for the Teamsters stated that since the violations in Case No. 26-CP-19 turned on the question of whether a 'valid' election had taken place on May 28, 1965, the propriety of the unit must be determined. The Trial Examiner excluded any evidence concerning the appropriateness of the unit, for he was satisfied that the question had been thoroughly dealt with in Case No. 26-RM-182.[5] He considered himself without authority to overrule the Board's prior determination. He concluded that the Union had violated Section 8(b)(4)(i) and (ii)(B) and Section 8(b)(7)(B) of the Act. The Board disagreed with the Trial Examiner's decision and remanded the consolidated cause to him with directions to take evidence concerning the appropriateness of the unit in the expedited election. After taking evidence, the Trial Examiner decided that the expedited election was invalid, for the voting unit improperly included transport drivers. In his Supplemental Report filed in late 1966, he concluded that since there never was a valid election, the Teamsters could not be found guilty of violations set forth in Cases Nos. 26-CC-94 and 26-CP-19. His recommendations to the Board were consistent with his finding.
 
 
 10
 Some two years later, on March 7, 1968, the Board reversed the Trial Examiner in part.[6] It concluded that even though a valid election had not taken place, the Teamsters did violate Section 8(b)(4)(i) and (ii)(B) of the Act by picketing Shoney's Big Boy Restaurant, Flaming Steer Restaurant and E. I. du Pont de Nemours. The Board adopted the rest of the Trial Examiner's report and is petitioning for enforcement. In Case No. 18,566 the Company seeks to have that portion of the Board's order declaring the election unit inappropriate and directing a second election vacated and set aside, while in Case No. 18,650 the Teamsters seek to have the Board's order vacated as to the secondary boycott violations under Section 8(b)(4)(i) and (ii)(B) of the Act.
 
 No. 18,567
 
 11
 During the period the above causes were pending before the Trial Examiner and the Board, events occurred which added confusion to an already complex situation.[7] In March of 1966, almost a year after their prior organizational campaign, the Teamsters renewed their efforts to organize the American Bread Company. This time they sought only to represent the route salesmen. On March 23, 1966, the Teamsters wrote President Evers of the American Bread Company and demanded recognition as the representative of the route salesmen. Since President Evers was cognizant of the organizational activities of ABC at that time, he walked through the plant and polled certain employees as to the relative strength of the rival unions. He heard that there had been a shift from the Teamsters over to ABC. Having found that only about sixteen out of a unit of 92 route salesmen were favorable to the Teamsters, he refused recognition.
 
 
 12
 On April 5, 1966, ABC claimed it had signed a majority of a unit composed of production and maintenance employees, route salesmen, and transport drivers. President Evers once again polled some of his employees to discover the strength of ABC. He learned that there was a good possibility that ABC did have a majority. Evers agreed to a card check by a clergyman. After running a check of the card signatures against those on payroll receipts, the clergyman concluded that the ABC had a majority.[8] There was no cross-check against Teamster cards, but the record reveals that the Teamsters only had eight cards signed at this time. President Evers recognized ABC as the exclusive bargaining unit and a contract was executed on May 8, 1966. Successful relations have existed up to the present.
 
 
 13
 In early June of 1966 the Regional Director issued a complaint against the Company for a violation of Section 8(a)(1) and (2) of the Act by recognizing one of two rival unions while a real question concerning representation existed. In a subsequent hearing the Board found the Company guilty of the alleged violations and ordered it to stop recognizing ABC.[9] The Company is petitioning to have to Board's order vacated; while the Board is cross-petitioning for enforcement.
 
 
 14
 This Court has permitted both the Teamsters and ABC to file briefs as intervenors.
 
 
 15
 In the adjudication of these consolidated appeals numerous questions are raised. However, in our opinion there are three basic questions to which we address our attention: (1) Did the Board abuse its discretion by ordering the Trial Examiner to take evidence concerning the appropriateness of the election unit? (2) Did the picketing by the Teamsters at E. I. du Pont, the Flaming Steer Restaurant, and Shoney's Big Boy Restaurant constitute unlawful secondary activity? and (3) On April 5, 1966 when the American Bread Company recognized ABC, was there a real question concerning representation existent?
 
 No. 18,566
 Unit Determination:
 
 16
 It is the basic contention of American Bread that since the question regarding 'unit determination' had previously been litigated, it could not be attacked collaterally in a subsequent unfair labor practice dispute. However, the parties agree that the question pertaining to the legality of the recognitional picketing of American Bread turns on whether a valid election took place.
 
 
 17
 American Bread places great reliance on the rules and regulations which the Board has promulgated under its discretionary authority. National Labor Relations Board v. A. J. Tower Co., 329 U.S. 324, 67 S.Ct. 324, 91 L.Ed. 322 (1946). It strongly urges that according to Section 102.67(f), 29 C.F.R. 102.67(f), the Board would be barred from permitting evidence to be submitted on the question of the validity of the voting unit, since the several attempts by the Teamsters to have the question dealt with on appeal had been denied. The Company further urges that the policy relating to finality of litigation should be applied here. It is the opinion of this Court that under the circumstances of this case the Board did not abuse its discretion by permitting the introduction of evidence concerning the propriety of the election unit. Neither party had an absolute right to have the proffered evidence entered. N.L.R.B. v. B. H. Hadley, Inc., 322 F.2d 281 (9th Cir. 1963), see: Pittsburgh Plate Class Company v. N.L.R.B., 313 U.S. 146, 61 S.Ct. 908, 85 L.Ed. 1251 (1941). However, the Court in Hadley,supra, stated that '* * * it is within the Board's discretionary power to refuse to consider the issue.' Since the matter is within its discretionary power, we will not overturn the Board's ruling unless an abusive use of that discretion took place. This Court is cognizant of the rules and regulations of the Board, but '* * * we must respect the wide discretion of the Board, to determine in any case whether an exception should be made to its prescribed rules and regulations.' N.L.R.B. v. Ideal Laundry and Dry Cleaning Co., 330 F.2d 712, 718 (10th Cir. 1964). This Court is not aware of an absolute bar in an administrative proceeding that would prohibit the relitigation in a subsequent unfair labor practice proceeding of an issue covered and decided in a representation proceeding. N.L.R.B. v. Ideal Laundry and Dry Cleaning Co., 330 F.2d 712, 716 (10th Cir. 1964); N.L.R.B. v. B. H. Hadley, Inc., 322 F.2d 281, 286 (9th Cir. 1963); District 50, United Mine Workers v. N.L.R.B., 234 F.2d 565, 568 (4th Cir. 1956). See Pittsburgh Plate Glass Co. v. Board, 313 U.S. 146, 61 S.Ct. 908, 85 L.Ed. 1251 (1941), N.L.R.B. v. Lawrence Typographical Union No. 570, 376 F.2d 643 (10th Cir. 1967). In the instant case the Board weighed the importance of the stability and finality of its prior decision against allowing the proffered evidence. Cf. N.L.R.B. v. Dewey Portland Cement Co., 336 F.2d 117 (10th Cir. 1964). We see no abuse in the discretion of the Board and recognize that to achieve substantive due process the Board may be required to travel outside its prescribed rules and regulations.
 
 
 18
 Once having the proffered evidence properly before the Board, the Court is now faced with the question of whether the unit determination was properly dealt with in the remand hearing. Again the Court is dealing in an area where the Board employs discretionary powers. The unit determination is a question of fact to be determined upon the facts of each case. As such, this Court will not disturb the decision unless it was arrived at in an arbitrary, capricious or unreasonable manner, or in violation of the statute. Packard Motor Car Co. v. N.L.R.B., 330 U.S. 485, 491, 67 S.Ct. 789, 91 L.Ed. 1040 (1947); Pittsburgh Plate Glass Co. v. N.L.R.B., 313 U.S. 146, 61 S.Ct. 908, 85 L.Ed. 1251 (1941).
 
 
 19
 The long standing policy of the Board had been to automatically include truck drivers in a comprehensive unit where there was no disagreement as to its composition. See Valley of Virginia Cooperative Milk Producers Ass'n., 127 N.L.R.B. 785 (1960). This policy has since been abandoned. Koester Bakery Co., 136 N.L.R.B. 1006 (1962). In making its unit determination today, the Board considers the workers' community of interest, the truckdrivers' similarity or relation to other employees with regard to duties, pay, hours, supervision and the portion of their time spent at production or adjunct activities. Koester Bakery Co., 136 N.L.R.B. 1006, 1011 (1962). The Board also takes into account whether or not the labor organization wishes to represent all or merely a portion of the entire employee group. MC-MOR-HAN Trucking Co., Inc., 166 N.L.R.B. 44 (1966). See Balletin Packing Co., 132 N.L.R.B. 923 (1961).
 
 
 20
 In the instant case there was not an arbitrary or capricious finding as American Bread insists. The Trial Examiner considered the circumstances surrounding the transport drivers' employment and their relation to the Teamsters' organizational plan. It is quite evident from the record that the Teamsters were not trying to organize the transport drivers. See Ballentine Packing Co., 132 N.L.R.B. 923 (1961). It is true that one authorization card was signed by a transport driver, but the Trial Examiner concluded from the testimony before him that it was a mistake. This Court recognizes how such a mistake could be made since it is aware of the tension which surrounds organizational campaigns. In order to determine the Teamsters' intent it is permissible to consider the several attempts before and after the expedited election to have the transport drivers excluded from the voting unit. We conclude that there was substantial evidence in the record to permit the Board to find that no attempt was made on the part of the Teamsters to organize the transport workers.
 
 
 21
 After the policy change in Koester Bakery Co., 136 N.L.R.B. 1006, when a situation exists where there is no previous bargaining history, where the transport drivers are separated from the production process, where their mode of compensation, hours, and working conditions are different are where most of their time is spent away from the plant, transport drivers may be excluded from a bargaining unit comprised of production and maintenance employees. Delight Bakery, Inc., 145 N.L.R.B. 893 (1964), enforced 353 F.2d 344 (6th Cir. 1965). It is true though that if the Teamsters had desired to represent the transport drivers in a plantwide unit, the Board would have weighed it any may have allowed their inclusion. Marks Oxygen Co., 147 N.L.R.B. 228 (1964). See MC-MOR-HAN Trucking Co., 166 N.L.R.B. 44 (1966); Valley of Virginia Cooperative Milk Producers Ass'n, 127 N.L.R.B. 785 (1960). Although this is not controlling, it is another factor which may be taken into consideration by the Board. N.L.R.B. v. Metropolitan Life Insurance Co., 380 U.S. 438, 85 S.Ct. 1061, 13 L.Ed.2d 951 (1964). This Court sees no abuse of the Board's discretion in excluding the truck drivers from the unit, nor do we see merit in American Bread's contention that since transport drivers were on the picket line they should be included in the unit, for the Trial Examiner concluded that evidence to that effect was incompetent. Jervis Corporation, Bolivar Division v. N.L.R.B., 387 F.2d 107, 112 (6th Cir. 1967); N.L.R.B. v. Challenge Cook Brothers of Ohio, Inc.,374 F.2d 147, 152 (6th Cir. 1967). See Woodco Corp., 129 N.L.R.B. 1188 (1961).
 
 No. 18,650
 Secondary Picketing:
 
 22
 We now turn our attention to the allegations concerning the secondary picketing at E. I. du Pont de Nemours Company, Shoney's Big Boy Restaurant, and the Flaming Steer Restaurant.
 
 
 23
 It is the Teamsters' contention that they are permitted to participate in this type of consumer picketing as long as it is limited to following the struck product. N.L.R.B. v. Fruit and Vegetable Packers Local 760, 377 U.S. 58, 84 S.Ct. 1063, 12 L.Ed.2d 129 (1964) (hereinafter Tree Fruits). However, the Board urges that since the product in question is integrated into most of the food served by the above-named establishments, in reality the Teamsters are asking the public to boycott them entirely. Honolulu Typographical Union No. 37 v. N.L.R.B., 131 U.S.App.D.C. 1, 401 F.2d 952 (1968) (hereinafter Honolulu Typographical). The Board requests this Court to direct its attention not to the supposed form, but to the reality of the picketing. Here, American Bread's output was integrated into the meals served by the restaurants and could not readily be recognized by the customers as to particular brand. In order for customers to express sympathy for the Teamsters' cause, they would necessarily have to refrain from ordering any meal served with bread or bakery products. This would entail practically a boycott on all the meals served in the establishments.
 
 
 24
 The situation facing this Court is quite similar to the one dealt with in Honolulu Typographical wherein the Union's request that people refrain from buying the products advertised in a newspaper was deemed by the Court to be an unlawful secondary boycott. The Court distinguished that case from the Supreme Court decision in Tree Fruits on the basis of a product which had lost its identity and become fully integrated into the output of the party being hit with the secondary picketing. In Tree Fruits, Washington State apples were being sold in retail outlets and could be distinguished from other apples by the consumer. There the consumers could continue their normal shopping and still sympathize with the Union by refraining from the purchase of Washington State apples. In the case before us consumers would have to stop ordering sandwiches, baked goods and all meals served or made with bread. It is this Court's opinion that the picketing of these restaurants produced illegal secondary boycotts since the subject matter of the picketing had become so integrated into the food served that to cease purchasing the single item would almost amount to customers stopping all trade with the secondary employer. As such, this Court feels that the picketing was in violation of Section 8(b)(4) (i) and (ii)(B) of the Act. Honolulu Typographical Union No. 37 v. N.L.R.B., 131 U.S.App.D.C. 1, 401 F.2d 952 (1967).
 
 
 25
 It should also be noted that in Tree Fruits, the Union conducted a rather orderly boycott. There were no side effects such as refusals to load or unload apples or work stoppages. The time periods of the picketing were such that it was geared to reach only the patrons of the store-- and not to influence employees going to and coming from work. Such was not the case in the picketing at DuPont's cafeteria which was operated by a concessionaire, Progressive Cafeterias. The Teamsters' representative informed DuPont that unless the American Bread Company deliveries to the cafeteria were stopped, picketing at DuPont would result. The intent was to pressure DuPont into forcing the concessionaire to stop purchasing from American Bread. Since DuPont had contracted out the cafeteria concession, it could not readily control purchases there. Subsequently, picketing did occur at DuPont which was supposedly aimed only at the patrons of the cafeteria. However, pickets were placed at gates used exclusively by DuPont's construction workers who did not use the cafeteria. The Teamsters may have had their placards addressed 'to the consumer', but in actuality they were aimed at all employees of DuPont and not just those using the cafeteria. When the American Bread Company did deliver to the cafeteria, the Teamster craft employed at DuPont walked out. This type of activity against a neutral employer is prohibited by Section 8(b)(4)(i) and (ii)(B) of the Act. N.L.R.B. v. Cuyahoga, Lake, Geauga and Ashtabula Counties Carpenters' District Council, United Brotherhood of Carpenters and Joiners of America, 338 F.2d 958 (6th Cir. 1964). This Court will not overturn the Board's determination, for there is substantial evidence supporting its finding in the record. Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).
 
 No. 18,567
 Question Concerning Representation:
 
 26
 The question now facing the Court is whether there existed a real question concerning representation when the Company recognized ABC as the exclusive bargaining agent. Midwest Piping & Supply Company, Inc., 63 N.L.R.B. 1060 (1945). The determination of this question is necessarily contingent upon the particular facts of each case. N.L.R.B. v. North Electric Co., 296 F.2d 137, 139 (6th Cir. 1961).
 
 
 27
 This Court is asked to order the Company to refrain from recognizing ABC. However, the record indicates that ABC and the Company have had a successful as well as peaceful relationship since May of 1966. One of the objectives of the National Labor Relations Act is to promote peace and tranquility between labor and management while insuring employees the opportunity to be represented by the union of their choice. However, this alone is not sufficient if at the time of recognition of ABC, there existed a real question concerning representation. Midwest Piping & Supply Company Inc., 63 N.L.R.B. 1060 (1945).
 
 
 28
 As stated in N.L.R.B. v. Standard Steel Spring Co.,
 
 
 29
 'This is not a case where a company has interfered with the right of its employees to a fair, unhampered choice of their bargaining representative, or where it has intruded its economic powers to assert or encourage, or to oppose or discourage adherence to a particular labor organization. Respondent Company did not enter a race between competing unions, nor give one an improper advantage during a campaign for the employees' favor.' N.L.R.B. v. Standard Steel Spring Co., 180 F.2d 942, 946 (6th Cir. 1950).
 
 
 30
 See Iowa Beef Packers, Inc. v. N.L.R.B., 331 F.2d 176, 184 (8th Cir. 1964). Nor is this a situation where the employees had not crystallized their choice of union. N.L.R.B. v. Air Master Corp., 339 F.2d 553, 557 (3rd Cir. 1964).
 
 
 31
 We do not find that the record substantially supports the holding of the Board. The Company treated the claims of the Teamsters and ABC in substantially the same manner. N.L.R.B. v. North Electric Co., 296 F.2d 137, 139 (6th Cir. 1961). It was solely the efforts of ABC and not those of the Company that caused a majority of the employees to sign with ABC. The record does not indicate that the Company immediately recognized ABC in order to preclude dealing with the Teamsters. A card check against the payroll was conducted by an impartial clergyman prior to recognition. It was discovered that ABC represented a clear majority.[10] Since the choice of the employees had been made manifest, the Company did not breach its neutral position by recognizing ABC. See N.L.R.B. v. Air Master Corporation, 339 F.2d 553, 556 (3rd Cir. 1964); N.L.R.B. v. North Electric Company, 296 F.2d 137, 139 (6th Cir. 1961); District 50, United Mine Workers v. N.L.R.B., 234 F.2d 565, 569 (4th Cir. 1956). At that time the Teamsters had only eight newly signed cards out of a unit of over 90. This alone would not have been enough to raise a real question concerning representation. However, the Board claims that when you consider the totality of circumstances surrounding the Teamsters' organization of the Company, a real question concerning representation existed. After reviewing the record, this Court cannot agree with the Board that there is substantial evidence supporting its position. Therefore, we cannot sustain the Board's position that the Company committed an unfair labor practice in violation of Section 8(a)(2) of the Act by recognizing ABC. N.L.R.B. v. Standard Spring Steel Co., 180 F.2d 942 (6th Cir. 1950). See N.L.R.B. v. North Electric Co., 296 F.2d 137 (6th Cir. 1961).
 
 
 32
 The Company would have us review the Board's order directing a second election. However, the Court is without jurisdiction to do so under either Section 9(d) or Sections 10(e) and (f) of the Act.
 
 
 33
 'American Federation of Labor v. NLRB, 1940, 308 U.S. 401, 60 S.Ct. 300, 84 L.Ed. 347; (and) NLRB v. International Brotherhood of Electrical Workers, 1940, 308 U.S. 413, 60 S.Ct. 306, 84 L.Ed. 354, * * * (made it) * * * clear that Courts of Appeals do not have the power to review representation proceedings. And jurisdiction does not come into being because the representation order arises out of a consolidated hearing as to which the Court of Appeals has jurisdiction to review the order concerning unfair labor practices.' Hendrix Manufacturing Co. v. N.L.R.B., 321 F.2d 100, 106 (5th Cir. 1963).
 
 
 34
 See Boire v. Greyhound Corp., 376 U.S. 473, 84 S.Ct. 894, 11 L.Ed.2d 849 (1964). Holly Hill Lumber Company v. N.L.R.B., 380 F.2d 838, 840 (4th Cir. 1967); Retail, Wholesale & Department Store Union v. N.L.R.B., 128 U.S.App.D.C. 41, 385 F.2d 301 (1967); Daniel Construction Co. v. N.L.R.B., 341 F.2d 805 (4th Cir. 1965) cert. den. 382 U.S. 831, 86 S.Ct. 70, 15 L.Ed.2d 75 (1965); Urethane Corp. of California v. Kennedy, 332 F.2d 564, 565 (9th Cir. 1964); N.L.R.B. v. Thompson Products, 162 F.2d 287 (6th Cir. 1947). However, this Court believes that in light of our decision in No. 18,567 the Board will find it necessary to reconsider its direction of a second election. This Court recognizes the purpose of the election would be to afford the employees with the opportunity to have the representative of their choice. This was already accomplished when the Company recognized ABC. N.L.R.B. v. Air Master Corp., 339 F.2d 553, 556 (3rd Cir. 1964). If there has been a change in the circumstances or employee desires over the past three years, a petition for a decertification election would be in order. The Court recommends that the Board reconsider its order for an election.
 
 
 35
 In Case No. 18,566 and Case No. 18,650 we conclude there was no error in the proceedings before the Trial Examiner or the Board. Accordingly, the Board's order will be enforced without modification.
 
 
 36
 In Case No. 18,567 we find there was not substantial evidence supporting the Board's decision. Therefore, enforcement of the Board's order will be denied.
 
 
 
 [1]
 The Board's decisions are reported at 170 N.L.R.B. No. 19 (March 7, 1968) and 170 N.L.R.B. No. 20 (March 7, 1968)
 
 
 [2]
 Prior to the expedited election the placards had read: 'Unfair labor practice. Sunbeam Bakery on strike. Local 327.' In the post-election picketing the 'Unfair labor practice' portion was scratched out
 
 
 [3]
 The Teamsters lost 131-125 in the final tabulation
 
 
 [4]
 The Regional Director refused issuance of a complaint in Case No. 26-CC-94, on the charge of a violation of Section 8(b)(4)(A) and (B) of the Act, but complaints were issued on other charges. In No. 26-CP-19 violations related to picketing carried on at the American Bread Company, while in No. 26-CC-94 violations related to secondary picketing at restaurants which handled American Bread products
 
 
 [5]
 This was a unit determination by the Board prior to the expedited election of May 28, 1965
 
 
 [6]
 This decision is reported at 170 N.L.R.B. No. 19 (March 7, 1968)
 
 
 [7]
 The Trial Examiner's Supplemental Decision in Nos. 18,566 and 18,650 was issued on November 8, 1966. It dealt not only with Cases Nos. 26-CC-94 and 26-CP-19, but also Case No. 26-RM-182 wherein the bargaining unit had been found by the Regional Director. The Board's decision was not filed until March 7, 1968, 170 N.L.R.B. No. 19 (March 7, 1968)
 
 
 [8]
 ABC signed 170 out of 295 employees
 
 
 [9]
 This decision may be found at 170 N.L.R.B. No. 20 (March 7, 1968). It should be noted that this decision and the one at 170 N.L.R.B. No. 19 (March 7, 1968) were pending before the Board for over fifteen months. For an even longer period, the Company and ABC had been enjoying successful and peaceful relations
 
 
 [10]
 ABC had procured 170 newly signed cards out of the unit of 295