HONOLULU TYPOGRAPHICAL UNION
NO. 37, International Typographical
Union, AFL–CIO, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 21367.

United States Court of Appeals
District of Columbia Circuit.

Argued May 20, 1968.

Decided Aug. 9, 1968.

Mr. George Kaufmann, Washington,
D. C., with whom Mr. Gerhard P. Van

Arkel, Washington, D. C., was on the brief, for petitioner.

Mr. Eugene B. Granof, Attorney, National Labor Relations Board, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, with whom Messrs. Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Assistant General Counsel, and Gary Green, Attorney, National Labor Relations Board, were on the brief, for respondent.

Before BASTIAN, Senior Circuit Judge, and TAMM and LEVENTHAL, Circuit Judges.

LEVENTHAL, Circuit Judge:

Honolulu Typographical Union No. 37 (the Union) petitions the court to set aside a decision and order of the National Labor Relations Board determining that the Union violated § 8(b) (4) (ii) (B) of the National Labor Relations Act [1] by consumer picketing and handbilling at the entrance to a shopping center. We uphold the Board and grant its cross-petition for enforcement of its order.

The Union was engaged in a labor dispute with Hawaii Press Newspapers, which publishes, among others, the Waikiki Beach Press, a tourist-oriented newspaper distributed free of charge and supported primarily by revenues from advertisers seeking the tourist's custom. At least five such advertisers, four restaurants and a jewelry shop, were located in the International Market Place, a privately owned shopping center in Waikiki housing more than fifty independent restaurants and stores catering to tourists. The Union set up a picket line of from thirty to sixty persons who marched "shoulder to shoulder" in an ellipse across the front entrance to Market Place. Each picket carried a sign stating:

(NAME OF ONE OF THE ADVERTISERS)
ADVERTISES IN THE WAIKIKI BEACH PRESS
WHICH IS ON STRIKE
KOKUA
DO NOT PURCHASE THEIR PRODUCTS
ADVERTISED IN THE STRUCK WAIKIKI BEACH PRESS
HONOLULU TYPOGRAPHICAL UNION, AFL-CIO

At the end of the ellipse in which the picketers were patrolling the Union distributed handbills, stating in part "Please Kokua!! Do Not Patronize This Establishment." Kokua, incidentally, is Hawaiian for—Please Help. The handbill went on to describe in detail the Union's dispute with Hawaii Press.

Section 8(b) (4) (ii) (B) of the Act provides that it shall be an unfair labor practice for a labor organization:

4(ii) to threaten, coerce, or restrain any person * * * where * * * an object thereof is—* * *

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person * * *

*Provided,* That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing; * * *

*Provided further,* That for the purposes of this paragraph (4) only, nothing contained in such paragraph shall be construed to prohibit publicity, other than picketing, for the purpose of truthfully advising the public, includ-

1. 29 U.S.C. § 158(b) (4) (ii) (B).

ing consumers and members of a labor organization, that a product or products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer, as long as such publicity does not have an effect of inducing any individual employed by any person other than the primary employer in the course of his employment to refuse to pick up, deliver, or transport any goods. or not to perform any services, at the establishment of the employer engaged in such distribution * * *."

### I.

■ We consider first the lawfulness of the picketing. Our starting point is NLRB v. Fruit & Vegetable Packers & Warehousemen, Local 760 (Tree Fruits), 377 U.S. 58, 84 S.Ct. 1063, 12 L.Ed.2d 129 (1964), where the Supreme Court held that union picketing at a supermarket, limited to requesting consumers not to purchase therein Washington State apples coming from firms against which the union was striking, did not violate section 8(b) (4) (ii) (B). The Court overturned the Board's ruling that all secondary consumer picketing violated § 8(b) (4) as amended in 1959.[2] The Court's rationale was that an appeal to consumers not to purchase the products of a struck primary employer does not, within the meaning of the Act, "threaten, restrain, or coerce" the secondary employer. So long as the picketing merely urged consumers to cease purchasing the primary product, and does not urge them to boycott and entirely cease their patronage of the secondary employer, the conduct does not violate the Act. The

Court, guided by First Amendment considerations, was unwilling to impute to Congress broad bans on peaceful picketing absent the clearest sort of indication in the legislative history. It recognized that "any diminution in Safeway's purchases of apples due to a drop in consumer demand might be said to be a result which causes respondents' picketing to fall literally within the statutory prohibition." But it held that picketing limited to "following the struck product" is not one of those "isolated evils" intended to be proscribed by Congress in its 1959 amendments.

The Union and the Board are at odds over the scope of this *Tree Fruits* doctrine when the economic setting of the dispute makes it impossible for consumers to cease purchasing the primary product without entirely ceasing patronage of the secondary employer. In this case, the pressured advertisers in the Waikiki Beach Press were, with one exception,[3] restaurants, and the advertising generally promoted the restaurants as places to eat. Therefore the picketing appeal to consumers not to buy "products advertised in the struck Waikiki Beach Press" was an attempt to cling to a legal concept evolved for another case even though the language patently does not fit the facts of this situation. The only realistic meaning of the appeal is the traditional "do not patronize this establishment." [4]

The Union nonetheless contends that § 8(b) (4) (ii) (B), as construed by *Tree Fruits*, does not cover this picketing. The argument has two steps. Relying on NLRB v. Servette, Inc., 377 U.S. 46, 84 S.Ct. 1098, 12 L.Ed.2d 121 (1964), and Great Western Broadcasting Corp.

---

2. Labor-Management Reporting and Disclosure Act of 1959 (Landrum-Griffin Act) § 704(a), 73 Stat. 542–43.

3. The exception was a jewelry store. The Union makes no claim that the picketing was limited to requesting a boycott of particular advertised products, and therefore did not call for a total boycott. In a footnote the Board reserved decision on the lawfulness of such limited picketing of the advertised product.

4. Any doubt that a consumer might have had as to the meaning of the picketing legend "Do Not Purchase Their Products Advertised in the Struck Waikiki Beach Press" as applied to the restaurant he had planned on entering must surely have been resolved by the handbills, expressly stating "Do Not Patronize This Establishment."

v. NLRB, 356 F.2d 434 (9th Cir. 1966), it urges that the intangible quality of advertising is irrelevant in assaying whether the customer while dining is in fact consuming the product of the primary employer, advertising. The Union then argues that its *Tree Fruits* right, to follow and urge consumers to avoid the struck primary product, cannot be limited merely because of the happenstance that this product (advertising) is reflected or incorporated in every item sold by the secondary employer.

The Board on the other hand has interpreted *Tree Fruits* to be inapplicable where the struck "product" has become an integral part of the retailer's entire offering, so that the product boycott will of necessity encompass the entire business of the secondary employer.[5] That interpretation has already received judicial approval.[6] We also agree.

The Board stresses these two portions of the Court's *Tree Fruits* opinion as key.

"Peaceful consumer picketing to shut off all trade with the secondary employer unless he aids the union in its dispute with the primary employer, is poles apart from such picketing which only persuades his customers not to buy the struck product." 377 U.S. at 70, 84 S.Ct. at 1070.

"When consumer picketing is employed only to persuade customers not to buy the struck product, the union's appeal is closely confined to the primary dispute. The site of the appeal is expanded to include the premises of the secondary employer, but if the appeal succeeds, the secondary employer's purchases from the struck firms are decreased only because the public has diminished its purchases of the struck product. On the other hand, when consumer picketing is employed to persuade customers not to trade at all with the secondary employer, the latter stops buying the struck product, not because of a falling demand, but in response to pressure designed to inflict injury on his business generally. In such case, the union does more than merely follow the struck product; it creates a separate dispute with the secondary employer." 377 U.S. at 72, 84 S.Ct. at 1071.

The Board relies, and we think properly, on the Court's distinction between limited and total boycott, which the Court buttressed by analogizing the picketing in *Tree Fruits* to primary picketing at a secondary situs. Although the Court did not characterize consumer picketing as primary, and thus protected as such by a proviso to 8(b) (4), it did stress that the picketing involved was closely confined to the primary dispute. Insofar as Safeway was pressured by the picketing,[7] that pressure was limited to the portion of Safeway's business that would have been disrupted in any event by a successful primary strike.[8] When the picketing appeal to consumers is expanded to request a total boycott of the secondary seller, however, there exists a different type of pressure, one that spreads to and disrupts his entire trade.

■■ In a sense it is true, as the Union contends, that the Board's inter-

---

5. *See e.g.*, Teamsters, Chauffeurs, Helpers and Taxicab Drivers Local 237 (American Bread Co.), 170 N.L.R.B. No. 19 (1968); Salem Building Trades Council, 163 N.L.R.B. No. 9 (1967), enforced *sub nom.* NLRB v. Salem Bldg. Trades Council, 388 F.2d 987 (9th Cir. 1968).

6. NLRB v. Salem Bldg. Trades Council, *supra* note 5, cf. NLRB v. Building Service Employees International Union, Local No. 105, 367 F.2d 227, 229 (10th Cir. 1966).

7. The Court apparently did not question that the object of the picketing was to force Safeway to cease dealing in struck Washington apples by making it unprofitable to do so.

8. Professor Lesnick's useful article, The Gravamen of the Secondary Boycott, 62 Colum.L.Rev. 1363 (1962), although limited to "common situs," "roving situs" and "reserved gate" problems, suggests that the union's intent to "subject the secondary to pressure different in kind from that generated against him by a primary strike" be viewed as the key, in those contexts, to determining prohibited secondary pressurings.

pretation of *Tree Fruits* gives broader immunity to those secondary sellers who happen to be retailing struck primary products that are so. merged into the seller's total business as to be indistinguishable therefrom.[9] The short answer, however, is that the law makes distinctions in terms of the tradition and economic realities of Union pressure, even though this may result in differences not easily subject. to logical delineation between the scope and kinds of picketing available to unions in different labor circumstances.[10]

Here, where picketing means a total boycott, one interest must plainly yield, either the Union's desire to maximize pressure on the primary employer (the newspaper) by cutting off its markets or the neutral's desire to avoid a boycott of his entire business. In the 1959 amendments, Congress chose protection of .the neutral from this sort of disruption as the interest more deserving of protection. Indeed, the Supreme Court so stated in *Tree Fruits* when it characterized as one of the "isolated 'evils" barred by § 8(b) (4) (ii) (B), "picketing which persuades the customers of a secondary employer to stop all trading with him." 377 U.S. at 71, 84 S.Ct. at 1070.

---

9. We need not decide in this case, nor do we intimate a view on, the question whether a secondary seller who sells only the struck primary product may be picketed even though the appeal necessarily amounts to a request that .consumers cease all patronage. That was, in substance, the hard problem posed by the *Tree Fruits*, dissenters, 377 U.S. at 83, 84 S.Ct. 1063. It may be that this issue will be academic, and that in real life situations the economic interrelationships between the primary employer and such a secondary seller require that the latter be considered as an "ally." *See, e.g.*, Local 282, Int'l Brh'd of Teamsters (Acme Concrete & Supply Corp.), 137 N.L.R.B. 1321 (1960). *Compare* Local 418, Grain Elevator, Flour & Feed Mill Workers (Continental Grain Co.), 155 N.L.R.B. 402 (1965), enforced, 126 U.S.App.D.C. 219, 376 F.2d 774, cert. denied, 389 U.S. 932, 88 S.Ct. 296, 19 L.Ed.2d 285 (1967).

In its brief Board counsel argues that in any event advertising is not a "product" retailed by the restaurants, and therefore that it cannot be followed by the Union. However, we do not read the Board's opinion in this case as having held that advertising is not a "product" capable of being "followed" by urging boycott of the advertisers' wares, and we therefore need not decide the question, cf. Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962) ; Braniff Airways, Inc. v. CAB, 126 U.S.App.D.C. 399, 410–411, 379 F.2d 453, 464–465 (1967).

The approach of Board counsel would conform to consumer understanding, as the consumer does not consider that he is purchasing a seller's advertising (or for that matter electricity, bank financing, janitorial services) even though these items are a part of the seller's overall activities and expenses. But such an approach would run into the difficulty that a Union engaged in a dispute with the employer supplying these services has the right under the proviso in § 8(b) (4) to advise the customers of the secondary seller "that a product or products are produced by an employer with whom the labor organization has a primary dispute." NLRB v. Servette, Inc., 377 U.S. 46, 84 S.Ct. 1098, 12 L.Ed.2d 121 (1964) ; Great Western Broadcasting Corp. v. NLRB, 356 F.2d 434 (9th Cir. 1966). Perhaps "product" in the *Tree Fruits* rule may be given narrower scope than the terms in the proviso, but this conceptual difficulty is avoided by recognizing the economic reality that items like advertising and overhead services are "products" indirectly purchased by the consumers.

Regardless of whether the *Tree Fruits* doctrine is inapplicable whenever the item is one that the consumer does not recognize in the absence. of picketing as a product he is buying, certainly it is inapplicable ·when the product is one that permeates the entire business of the secondary seller.

We note that state law, on which the Supreme Court relied in upholding "product" picketing aimed at consumers, did not permit picketing of the secondary seller when the product sought to be followed was consumed by him as part of his general business. *See generally*, 1 L. Tellier, Labor Disputes and Collective Bargaining § 123.

10. Grain Elevator, Flour & Feed Mill Workers, etc., Local 418 v. NLRB, 126 U.S.App.D.C. 219, 224, 376 F.2d 774, 779, cert. denied, 389 U.S. 932, 88 S.Ct. 296, 19 L.Ed.2d 285 (1967).

We also think the Board's interpretation of *Tree Fruits* sound for other reasons. First Amendment considerations guided the Court in that decision. The pickets at Safeway made no request to consumers not to cross their picket line, indeed they made clear that continued patronage of Safeway was permissible. It is difficult to see how that sort of picketing is much different from merely issuing handbills making the same request that the consumer be selective in his purchases once he enters the store. Therefore, when the regulated aspects of the picketing are so close to pure speech, its broad prohibition raises substantial constitutional questions, which Congress presumably wished to avoid.

When the pickets urge, either directly or by requests that render their meaning obvious, the entire boycott of the secondary establishment, they inject a new element. The restraint generated by the need to cross any such picket line may entirely inhibit consumers who are not whole-hearted union men but are unwilling to be readily identified as hostile or indifferent. There is no similar impact where the picketing acquiesces in the crossing of the picket line but merely urges that the consumer be selective on the inside. It is that sort of limited picketing message that *Tree Fruits* held outside the spirit of § 8(b) (4) (ii) (B).[11]

■ Our analysis does not disagree with the Union's contention that the purpose of § 8(b) (4) (ii) (B) is not to protect consumers from confrontations they would prefer to avoid. It is, however, the purpose of the Act to protect the secondary seller from threats and coercion employed to establish certain objectives.[12] Obviously the character of this conduct as a threat to the secondary seller is a function of its impact on the consumer. Whatever the situation as to narrowly limited product picketing, it cannot be gainsaid that when customers must refuse to respect a picket line in order to enter the store, the storekeeper is being threatened within the meaning of the statute.

## II

■ The Board's determination that the Union's handbilling violated § 8(b) (4) (ii) (B) raises different questions. The handbills were distributed at the edges of the sixty-foot wide entrance way to the International Market Place, at the ends of the picket line that was patrolling across the entrance. The Board held that the reference on the handbills "Please Do Not Patronize This Establishment" clearly was to all the shops within the Market Place, all but two of which had to be reached by passing through the entrance. As the handbills referred to, and urged boycott of, businesses not advertising in the Waikiki Beach Press, the Board held that they were not "for the purpose of truthfully advising the public" and not protected by the publicity proviso to § 8(b) (4) set forth *supra*.

The Union contends first that the record does not support the determination that the handbills were misleading, pointing out that both of the corner businesses, the only two facing on to

---

11. The Union urges that § 8(b) (4) (ii) (B) is unconstitutional as applied to this conduct. Hughes v. Superior Court, 339 U. S. 460, 70 S.Ct. 718, 94 L.Ed. 985 (1950), holds constitutional the regulation of consumer picketing intended to compel an act contrary to a constitutionally permissible state policy, because of the "compulsive features inherent in picketing" 339 U.S. at 468, 70 S.Ct. 718. The second proviso to § 8(b) (4), however, makes it lawful to seek the object of a total consumer boycott of the secondary seller, and thereby generate this same pressure, so long as it is done by "publicity other than picketing." Justice Black, concurring in the *Tree Fruits* result, argued that § 8(b) (4) (ii) (B) was unconstitutional because stifling the communicative aspects of the picketing was the sole object of the statute.

Read as barring only picketing urging total consumer boycott, however, the statute strikes narrowly at those "inherently compulsive features" present when consumers must cross a line.

12. See note 7, *supra*.

the street rather than on to Market Place walks, were restaurants that did advertise in the struck paper. It was in front of these restaurants that the handbills were given out, and it is urged that the handbills referred only to them. Without belaboring the point, we think the facts of this handbilling, given its conjunction with Union activities at the entrance to the Market Place—a picket line blocking off the entrance to all the shops and Union-furnished musical entertainment—adequately support the Board's determination that consumers would think the handbills referred to all the shops in the Market Place.

More difficult is the Union's point that regardless of whether the handbills were misleading, any such consequence was unintentional. It is urged that the § 8(b) (4) publicity proviso be construed to protect inaccurate handbills so long as the Union does not issue them with knowledge of, or reckless disregard for, the inaccuracies, cf. New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). However, it is conceded that this point was not raised before the Board, and we see no extraordinary circumstances, required by section 10(e) of the Act, which would excuse the failure to raise the issue at the administrative level.[13]

The Union's petition to review is denied. The Board's petition to enforce is granted.

So ordered.

13 The Union contends that the Trial Examiner's theory of the case made presentation of this theory to the Board beside the point, cf. NLRB v. Richards, 265 F. 2d 855, 862 (3rd Cir. 1959). We disagree. The Trial Examiner decided the case on a theory that the Union's activities, taken *in toto* violated the Act, but he also held that "the handbills did not truthfully advise the public" and that they were therefore not within the protection accorded by the proviso. (JA 22) Thus, an argument that (1) the handbills were not misleading, but (2) even if misleading, they were for the *purpose* of truthfully advising the public, and therefore in any event protected by the proviso, would clearly have been appropriate.

Moreover, the Union contends that it is entitled to relief because the Board's decision is inconsistent with its prior decision in Local 537, Int'l Brh'd of Teamsters (Lohman Sales Co.), 132 N.L.

R.B. 901 (1961), and with its argument to the Supreme Court in NLRB v. Servette, Inc., n. 9, *supra*. In both instances untrue statements were held protected by the proviso. However, in neither case was the misrepresentation substantial; nor was its effect to impose unlawful pressure on the secondary seller.

Because the question of required "purpose" was not dealt with explicitly by the Board, and because of the First Amendment implications of any court order making handbilling subject to contempt proceedings, we make clear that there shall be no bar in any contempt proceedings initiated under our order, to raising again the question of whether or to what extent, either as a matter of statutory construction of the "for the purpose" phrase or of constitutional necessity, the 8(b) (4) publicity proviso protects materially untruthful or misleading statements concerning a labor dispute.