**LOCAL 14055, UNITED STEELWORKERS OF AMERICA, AFL–CIO, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

**Dow Chemical Company and Chamber of Commerce of the United States, Intervenors.**

No. 74–1632.

United States Court of Appeals, District of Columbia Circuit.

Argued May 22, 1975.

Decided Dec. 15, 1975.

**854**

Carl B. Frankel, with whom Michael H. Gottesman, Washington, D. C., was on the brief for petitioner.

John H. Ferguson, Atty., N. L. R. B., with whom John S. Irving, Deputy Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, and Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., were on the brief for respondent.

William A. Jackson, with whom Robert E. Williams, was on the brief for intervenor, The Dow Chemical Co.

Gerard C. Smetana, Chicago, Ill., with whom Milton A. Smith, Washington, D. C., Lawrence M. Cohen and Steven R. Semler, Chicago, Ill., were on the brief for intervenor The Chamber of Commerce of the United States.

Before BAZELON, Chief Judge, FAHY, Senior Circuit Judge, and McGOWAN, Circuit Judge.

FAHY, Senior Circuit Judge:

The Union petitions for review of an order of the Labor Board which holds that the Union had violated section 8(b)(4)(ii)(B)[1] of the Labor Act by en-

---

1. Section 8(b)(4)(ii)(B) of the National Labor Relations Act, *as amended* by the Labor-Management Reporting and Disclosure Act of 1959, is codified as 29 U.S.C. § 158(b)(4)(ii)(B). In relevant part it is reproduced, in context, below:

"It shall be an unfair labor practice for a labor organization or its agents—

\*　\*　\*　\*　\*　\*

"(4) \* \* \* (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

\*　\*　\*　\*　\*　\*

"(B) forcing or requiring any person to cease using, selling, handling, transporting,

gaging in a secondary boycott to be described. 211 NLRB No. 59. The Board has cross-applied for enforcement of its order.

## I

The controlling facts are not in dispute. The Union, while on strike against the Bay Refining Division of the Dow Chemical Company in Bay City, Michigan, picketed six gas stations in the surrounding area. The stations, as the Board stated, derived "their revenues largely from the sale of this gasoline, marketed under the trade name of 'Bay'. The picket signs asked consumers to Boycott Bay gasoline." [2] The percentage of Bay gas revenues to the respective total revenues of the stations was approximately as follows: Of the $280,000 gross annual revenue of one station 81% to 86% came from the sale of this gas; about 85% of the gross sales of $140,000 at a second; at a third station, in operation only about six months, $39,000 of its $40,000 gross revenues was due to Bay gas. The Board stated that this station, however, "leases its servicing facilities to an independent mechanic, and neither the lease rental nor the income of the mechanic (both unknown) is included in the $40,000 figure." A fourth station had gross revenues of $68,000, of which 91% came from "Bay gas and oil and other Dow products such as radiator

sealer, brake fluid, and windshield solvent." At a fifth station, 98% of its gross revenues of $45,000 was attributable to this gas. The sixth station, referred to as Alexander's, grossed altogether about $1,200,000 a year. Regarding this station the Board stated: "It is also a General Tire dealership. Its fuel (gas and diesel oil) sales account for 60 to 65 percent of gross revenues," and, the Board continued:

> This station sells gas other than Bay brand, and Alexander's owner, while at one point in his testimony estimating that Bay represented about 75 percent of his fuel sales, later stated that for the current year he did not know how much of the gas he sold was Bay. While it is not entirely clear from the record, it would appear that potential customers would not generally have known that gas other than Bay was available at the station.

Thus, if Bay gas accounted for about 75% of its fuel sales and its fuel sales accounted for 60 to 65 percent of its gross, Bay gas accounted for less than 50% of its gross revenues.

All six stations marketed products other than Bay gas. The variety of these products was quite great in the aggregate, but the percentage of revenue from them is as above stated.

or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: *Provided*, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing:

      \*    \*    \*    \*    \*    \*

" \* \* \* *Provided further*, That for the purposes of this paragraph (4) only, nothing contained in such paragraph shall be construed to prohibit publicity, other than picketing, for the purpose of truthfully advising the public, including consumers and members of a labor organization, that a product

or products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer, as long as such publicity does not have an effect of inducing any individual employed by any person other than the primary employer in the course of his employment to refuse to pick up, deliver, or transport any goods, or not to perform any services, at the establishment of the employer engaged in such distribution."

2. We do not believe, given the state of the record, that the wording itself of any picket signs led consumers to believe the picketing was directed to other than Bay gas. As shall appear, however, we limit our decision respecting the validity of the order under review to the reasons assigned by the Board for holding the picketing to have been unlawful under Section 8(b)(4).

The essential facts regarding the picketing we think are fairly stated in the dissenting opinion of Members Fanning and Jenkins as follows:

. . . the picketing of the six retail gas stations was at all times peaceful . . . . The record also reveals that the picketing did not cause any employee to stop working, nor otherwise interfere with deliveries to or pickups from the picketed sites, nor in any manner obstruct customer ingress and egress. The evidence affirmatively shows that the pickets stationed themselves on sidewalk locations away from entrances or exit driveways, that they did not appear until the station opened, and that they departed before it closed. The evidence also discloses that the . . . pickets limited their appeal to the struck product—"Bay gasoline." The legends on the picket signs generally stated: "Don't Buy Bay Gas," "Boycott Bay Gas," and "Bay Gasoline Made by Scabs."

In *Labor Board v. Fruit Packers*, 377 U.S. 58, 84 S.Ct. 1063, 12 L.Ed.2d 129 (1964),[3] the Court held that a union did not violate section 8(b)(4) by peacefully picketing Safeway Stores, with whom it had no dispute, urging their customers not to buy Washington State apples, purchased by the Safeway Stores from firms with whom the union did have a labor dispute.

In the present case the Board, deciding first that the six stations were neutral in the Union's dispute with Dow Chemical, notwithstanding certain close business relationships between the stations and Dow aside from their purchase of Bay gas, held the result depended upon whether the *Tree Fruits* decision of the Supreme Court applied. Being of the view that it did not, the Board's conclusion of the unlawfulness of the picketing under section 8(b)(4) followed. The Union, while not altogether ignoring the questioned relationship of the stations with Dow as it bears upon the neutrality of the stations,[4] assumes the neutral status of the gas stations in relying now primarily upon the applicability of *Tree Fruits*.

The Board accurately described as follows the holding of the Supreme Court in *Tree Fruits*:

that Section 8(b)(4) does not proscribe peaceful consumer picketing which is employed only to persuade customers not to buy the struck product, as opposed to picketing to persuade consumers to cease all trading with the secondary retailers.

Considering the factual situation in *Tree Fruits*, however, the Board interpreted the Court's decision as follows:

In *Tree Fruits*, the Supreme Court majority, finding that Section 8(b)(4) did not prohibit all peaceful consumer picketing at secondary sites, decided that the minimal impact the picketing there would have had, if successful, upon the total business of the secondary retailer would not justify a conclusion that an object of the union was to persuade the retailer to discontinue

---

**3.** This case is frequently referred to as *Tree Fruits*, which derives from the name of the organization of apple growers which filed the charges before the Board: Tree Fruits, Inc. [hereinafter *Tree Fruits*].

**4.** The Union's brief speaks of an "economic interdependence between Dow and the six picketed retailers . . . ." The Union argues that, if anything, such an interdependence tends to make picketing of the secondary more akin to primary picketing: "increasing the mutual interdependence between struck supplier and retailer serves to increase not decrease the 'primary' character of the picketing." Brief at 24. Further, it is urged,

"when the struck goods rise toward being the sole product of the secondary seller, he may, by virtue of his economic interrelationship with the primary supplier, become an 'ally' of the latter and thus lose his neutral status." Brief at 24–25. The Union suggests that the retailers might have to be considered as allies of Dow because of their "closely intertwined economic interdependency." The court will not upset the Board's finding of neutrality, but agrees that the putative alliance between a primary and a secondary selling almost exclusively the goods of the primary weakens the force of an "economic impact" test.

handling the struck product to cut its losses. It was on that basis, in our opinion, that it held that the picketing in that case did not "threaten, coerce, or restrain" the retailer within the meaning of Section 8(b)(4).

As to these six gas stations, however, the Board saw a substantially different situation, stating it as follows:

. . . the picketing was reasonably calculated to induce customers not to patronize the neutral parties, in this case the gas station operators, at all. Even though some of the stations involved sell tires and provide repair service, which special aspects of their business might be relatively unimpaired, most of their business is gasoline sales and minor items incidental thereto. Some, at least, would predictably be forced out of business if the picketing were successful, and all would predictably be squeezed to a position of duress, escapable only by abandoning Dow in favor of a new source of supply. It is not only the potential impact of the picketing, however, that distinguishes this case from *Tree Fruits*. It is, more importantly, the predictability of such impact that leads us to conclude that the picketing had an unlawful object.

Our disagreement with the conclusion thus reached is not conceived as a failure to accord due weight to a conclusion of the Board in a respect committed to its special expertise. Our position is due to a failure of the Board in our opinion to accord to peaceful picketing, directed to a struck product which is marketed at a secondary site, the favorable consideration to which it is entitled under *Tree Fruits* in determining both the object of the picketing under section 8(b)(4) and the duress the section tolerates in the circumstances of this case. We have a problem, also, with respect to the degree of success the Board contemplates in drawing a conclusion upon the supposition of successful picketing.

It is undoubtedly true that if the picketing in *Tree Fruits* were successful, the impact upon the total business of the Safeway Stores would be minimal. In contrast, considering the nature of the gasoline service station business, it is indeed likely that a successful consumer boycott of Bay gas would have substantial economic impact upon these six retail outlets. However, the Board was not unanimous that it was the limited economic impact on Safeway which rendered lawful the picketing in *Tree Fruits*. Nor did our court so interpret *Tree Fruits* in *Honolulu Typographical Union No. 37 v. NLRB,* 131 U.S.App.D.C. 1, 401 F.2d 952 (1968). The *Honolulu* court at least left open much that the Board considers the Supreme Court had foreclosed in *Tree Fruits* :

We need not decide in this case, nor do we intimate a view on, the question whether a secondary seller who sells only the struck primary product may be picketed even though the appeal necessarily amounts to a request that consumers cease all patronage. That was, in substance, the hard problem posed by the *Tree Fruits* [ ] dissenters

. . . .

*Id.* at 956, n. 9.

■ In our view the decision of the Supreme Court may not be limited in its application to a factual situation in which the struck product constitutes only a small part of the business of the secondary retailer; though the facts of the case decided are as we have stated, we think the reasoning of the opinion—its governing principles—formulated in light of the legislative history of section 8(b)(4), are not confined to the factual situation which was before the Court. The Court stated:

We have examined the legislative history of the amendments to § 8(b)(4), and conclude that it does not reflect with the requisite clarity a congressional plan to proscribe all peaceful consumer picketing at secondary sites, and, particularly any concern with peaceful picketing when it is limited, as here, to persuading Safeway customers not to buy Washington State apples when they traded in the Safe-

way stores. All that the legislative history shows in the way of an "isolated evil" believed to require proscription of peaceful consumer picketing at secondary sites, was its use to persuade the customers of the secondary to cease trading with him in order to force him to cease dealing with, or to put pressure upon, the primary employer. This narrow focus reflects the difference between such conduct and peaceful picketing at the secondary site directed only at the struck product. In the latter case, the union's appeal to the public is confined to its dispute with the primary employer, since the public is not asked to withhold its patronage from the secondary employer, but only to boycott the primary employer's goods. On the other hand, a union appeal to the public at the secondary site not to trade at all with the secondary employer goes beyond the goods of the primary employer, and seeks the public's assistance in forcing the secondary employer to cooperate with the union in its primary dispute. This is not to say that this distinction was expressly alluded to in the debates. It is to say, however, that the consumer picketing carried on in this case is not attended by the abuses at which the statute was directed. [footnote omitted.]

377 U.S. at 63–64,[5] 84 S.Ct. at 1066.

While the small part the struck product had in the whole of the Safeway business was not overlooked by the Court, it was not the basis for the decision. In considering the important question of the lawfulness of peaceful picketing at a secondary site, limited to publicizing a labor dispute with a primary employer, the Court did not focus upon the minimal impact of successful picketing in determining that the picketing did not have an illegal "object" within the meaning of section 8(b)(4). A broader view of the problem of peaceful picketing directed only to the struck product was considered. The Court accordingly reversed the decision of this court when the case was before us as *Fruit and Vegetable Packers & Warehousemen v. NLRB,* 113 U.S.App.D.C. 356, 308 F.2d 311 (1962). The Court held we had erred in remanding the case to the Board on the theory that the ultimate question of threat, coercion or restraint condemned by section 8(b)(4)[6] depended upon whether or not the picketing in fact had caused or was likely to cause a substantial economic impact on the secondary retailer.

### III

Consider the application of *Tree Fruits* to the picketing of Alexander's gas station. The relevant facts have been set forth above in Part I. As there stated it is probable that more than 50% of Alexander's annual gross revenues are derived from the sale of products other than Bay gas. This picketing, we think, cannot reasonably be held to have been aimed at "all trade" of Alexander's under the reasoning of the Court in *Tree Fruits.* As the Court there held, picketing "confined as it was to persuading customers to cease buying the product of the primary employer," 377 U.S. at 71, 84 S.Ct. at 1071, did not fall within the area Congress clearly indicated an intention to prohibit under section

---

**5.** Again the Court explained:

When consumer picketing is employed only to persuade customers not to buy the struck product, the union's appeal is closely confined to the primary dispute. The site of the appeal is expanded to include the premises of the secondary employer, but if the appeal succeeds, the secondary employer's purchases from the struck firms are decreased only because the public has diminished its purchases of the struck product. On the other hand, when consumer picketing is employed to persuade customers not to trade at all with the secondary employer, the latter stops buying the struck product, not because of a falling demand, but in response to pressure designed to inflict injury on his business generally. In such case, the union does more than merely follow the struck product; it creates a separate dispute with the secondary employer. [footnote omitted.]

377 U.S. at 72, 84 S.Ct. at 1071.

**6.** See footnote 1, *supra,* for text of the statute.

8(b)(4)(ii)(B) and, therefore, did not "threaten, coerce, or restrain" Safeway.[7] The composition of this statement by the Court is critically important. The Court did not say that the picketing in *Tree Fruits* did not threaten, coerce or restrain Safeway and therefore did not fall within the area Congress intended to prohibit by section 8(b)(4). The Court said that since the picketing was not conduct of the kind which Congress intended to prohibit by that provision, it followed that it did not threaten, coerce or restrain the secondary within the meaning Congress attached to the provision. It was not one of the "isolated evils" intended to be prohibited by section 8(b)(4). The Court viewed Congress as having determined that the possible loss to a secondary caused by this means of publicizing a labor dispute with the producer of the struck product, when weighed against a policy favoring the right peacefully to publicize the dispute, did not outweigh the right.

### IV

The factual difference between Alexander's and the other five stations does not lead to a different legal conclusion. The economic loss due to picketing at the other stations directed against Bay gas might or might not be very severe. One does not know how successful it would be. There is little in *Tree Fruits* to support a different conclusion with respect to the five other stations from that which we reach in Alexander's case, notwithstanding a high percentage of their gross revenues are attributable to sales of the struck product. As stated by Mr. Justice Harlan in dissenting from the Court's position in *Tree Fruits*:

. . . it cannot well be gainsaid that the rule laid down by the Court would be unworkable if its applicability turned on a calculation of the relation between total income of the secondary employer and income from the struck product.

377 U.S. at 83, 84 S.Ct. at 1077. Mr. Justice Harlan prefaced these observations by the following:

The distinction drawn by the majority becomes even more tenuous if a picketed retailer depends largely or entirely on sales of the struck product. If, for example, an independent gas station owner sells gasoline purchased from a struck gasoline company, one would not suppose he would feel less threatened, coerced, or restrained by picket signs which said "Do not buy X gasoline" than by signs which said "Do not patronize this gas station." . . .

377 U.S. at 83, 84 S.Ct. at 1077. The opinion of the Court in *Tree Fruits* seems to point to no such "unworkable" standard by which to determine lawfulness. To distinguish between the stations in here applying section 8(b)(4) would be inconsistent also with the Court's reversal of our remand of the *Tree Fruits* case for Board consideration of the economic impact which the picketing actually caused or was likely to have caused.

In some situations the validity of a regulation does depend, not upon the fact of particular conduct but upon the degree of the association of the conduct with a congressional purpose. *Labor Board v. Jones & Laughlin,* 301 U.S. 1, 37, 57 S.Ct. 615, 81 L.Ed. 893 (1937). In according to employees, however, the

---

7. This court's opinion in *Honolulu Typographical Union No. 37 v. NLRB, supra,* characterizes the impact which pickets have upon persons who, though not fully in sympathy with the labor union, may be very hesitant to cross its picket lines:

The restraint generated by the need to cross any such picket line may entirely inhibit consumers who are not whole-hearted union men but are unwilling to be readily identified as hostile or indifferent. There is no similar impact where the picketing acquiesces in the crossing of the picket line but merely urges that the consumer be selective on the inside. It is that sort of limited picketing message that *Tree Fruits* held outside the spirit of § 8(b)(4)(ii)(B). 401 F.2d at 957. Here, however, restraint is muted, and the applicability of *Tree Fruits* strengthened by the fact that the overwhelming proportion of service station customers arrive by and conduct their transactions from their vehicles.

right to publicize in a peaceful manner their dispute with a primary party by making it known at a secondary site where the primary's struck product is offered for sale, we think the Court did not consider that the lawfulness of the exercise of the right depended upon differences in the degree of the possible economic impact upon the secondary; an unlawful object was not to be imputed from the possible economic effect of the picketing if it was peaceful and directed only to the struck product. This we think is the situation even though the economic effect were predictably severe if the picketing became very successful. As the dissenting Board members stated in the present case, "the appeal did not extend beyond Bay gasoline, the struck product"; therefore, nothing in the Union's conduct "goes beyond the limits approved in Tree Fruits." With such an appeal any coercion which might grow out of the fact that sales of Bay gas represented most of the station's gross revenue is not unlawful under section 8(b)(4), for the object of the appeal is not condemned by that section. The picketing was not a signal for conduct on the part of anyone except as an appeal to the public not to purchase Bay gas.[8] No compulsion was exerted upon employees, or upon the public other than the communication of a desire that the public respond to the Union's request not to buy Bay gas and by so responding to aid its side in the controversy with Dow Chemical. The public was not asked to abstain from all trade with the gas station. This differentiates the case from Honolulu Typographical Union No. 37 v. NLRB, supra, and American Bread Co. v. NLRB, 411 F.2d 147 (6th Cir. 1969). The appeals to the public in those cases, as the courts held, called for boycotting of more than the struck product. In those "merged product" cases, it was simply not possible to "follow the struck

goods" either because those goods were intangible (such as advertising) or because as ingredients in the products of the secondary (baked goods in restaurant meals) they lost their identity.

## V

■■ The Board's position has its persuasiveness. It would be more persuasive, were the Board free of Tree Fruits. Its position is not entitled to the usual deference due an agency's construction of a statute it administers; for the case involves the appropriate application of a construction of the statute by the Supreme Court. This is a judicial function no less than an agency's. Moreover, the decision of the Supreme Court and our application of it are influenced by a rule of statutory construction which requires the courts to avoid unnecessary confrontation with the constitutional guarantee of freedom of speech:

> The cardinal principle of statutory construction is to save and not to destroy. We have repeatedly held that as between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, our plain duty is to adopt that which will save the act. Even to avoid a serious doubt the rule is the same.

Jones & Laughlin, supra, 301 U.S. at 30, 57 S.Ct. at 621. In Tree Fruits the Court stated:

> Throughout the history of federal regulation of labor relations, Congress has consistently refused to prohibit peaceful picketing except where it is used as a means to achieve specific ends which experience has shown are undesirable. . . . Both the congressional policy and our adherence to this principle of interpretation reflect concern that a broad ban against peaceful

---

**8.** Signal picketing is peaceful picketing at the site of the secondary which is engaged in for the purpose of "signalling" to the employees of a secondary a desire that they engage in a sympathy strike. See Electrical Workers v.

Labor Board, 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299 (1951); National Maritime Union of America, AFL–CIO v. NLRB, 342 F.2d 538, 545–546 (2nd Cir. 1965).

picketing might collide with the guarantees of the First Amendment. 377 U.S. at 62–63, 84 S.Ct. at 1066.

When *Tree Fruits* was before this court, Judge Bazelon pointed out for the court the "cases which teach that when two interpretations are possible, courts must construe a statute narrowly to avoid reaching constitutional issues. We must also give full consideration to the stated desire of key legislators to avoid constitutional encroachments." 308 F.2d 311, at 317.[9]

Mr. Justice Black, disagreeing with the Court in *Tree Fruits* as to what Congress intended—being of the view that peaceful consumer picketing of a secondary employer was intended to be proscribed as unlawful under section 8(b)(4)—would have held the statute so construed to violate the guarantees of the First Amendment, and for that reason joined the Court in setting aside the Board's order. 377 U.S. at 76, 84 S.Ct. 1063, *et seq.* Mr. Justice Harlan, with Mr. Justice Stewart, were of the opinion that neither section 8(b)(4) nor the First Amendment protected the picketing; and the Board by its limitation upon consumer picketing of a peaceful character held lawful in *Tree Fruits,* gives rise to but does not pass upon a First Amendment issue similar to that avoided by the Supreme Court,[10] and now avoided by this court in our interpretation of *Tree Fruits.*

We think that in light of *Tree Fruits* we may not hold Congress intended by section 8(b)(4) that the exercise of the arguable First Amendment right should turn for its lawfulness upon a factor exceedingly difficult to subject to line-drawing, and as to which a union exercising the claimed right might have poor information as to where to draw the line.

The petition to set aside the order of the Board is granted, and the application of the Board for its enforcement is denied.

---

9. The court held that section 8(b)(4) did not ban all secondary consumer picketing, stating:

> Viewed as a whole, the statute does not reflect Congress' intent to ban all secondary consumer picketing. What Congress has said is that it shall be an unfair labor practice for a union "to threaten, coerce, or restrain any person engaged in commerce * * * where * * * an object thereof is * * * forcing or requiring any person to cease * * * selling * * * the products of any other producer * * *." Each of these terms has a meaning; each must be given effect. None can be ignored or repealed by reference to the legislative history. It is significant that when Congress wanted to outlaw picketing *per se,* it knew how to do so, as is evidenced by § 8(b)(7), which forbids a union in certain circumstances "to picket or cause to be picketed, any employer" if its object is to force him to recognize an uncertified union.
>
> As we construe the statute, it condemns not picketing as such, but the use of threats, coercion and restraint to achieve specified objectives.

*Id.*

10. We note that this industry is such that if the Board's rationale is applied, a union may effectively be limited to picketing at a primary site and on the premises of a few secondaries such as Alexander's.