**K & K CONSTRUCTION CO., INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

**Local Union No. 399, United Brotherhood of Carpenters and Joiners of America, AFL–CIO, Intervenor.**

**No. 78–1059.**

United States Court of Appeals, Third Circuit.

Argued Nov. 14, 1978.

Decided Jan. 12, 1979.

---

16. We assume *arguendo* Romero joined in the mid-trial severance motion made by counsel for other defendants.

Ronald L. Tobia, Kent A. F. Weisert, Schwartz, Steinberg, Tobia & Stanziale, East Orange, N. J., for petitioner; Robert J. Hickey, Peter Kilgore, Kirlin, Campbell & Keating, Washington, D. C., of counsel.

Theodore S. Meth, Meth, Wood, Jahos & Broege, Red Bank, N. J., for intervenor; Robert M. Wood, Red Bank, N. J., of counsel.

Michael S. Winer, Mary Schuette, National Labor Relations Board, John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, Elliott Moore, Dep. Assoc. Gen. Counsel, National Labor Relations Board, Washington, D. C., for respondent.

Before SEITZ, Chief Judge and GIB-BONS and WEIS, Circuit Judges.

## OPINION OF THE COURT

WEIS, Circuit Judge.

Area standards picketing by a construction union directed at a contractor but carried on at a housing developer's sales office is the subject of this appeal. A divided National Labor Relations Board refused to find that the union's activity was within the prohibition against secondary picketing included in the 1959 amendments to the National Labor Relations Act. We conclude that the Board erred in characterizing the picketing as primary and failing to apply the settled merged product rule. Accordingly, the Board's order will be set aside and the case will be remanded for appropriate action.

The Panther Valley construction site in Allamuchy, New Jersey encompasses an irregularly shaped area about two and a half miles long and two miles wide. It is owned by Panther Valley, Ltd. which over a period

of time had constructed a number of homes in the area. A subcontractor, K & K Construction Co., Inc., performed the carpentry work involved in framing the houses. In 1975, Local Union No. 399, United Brotherhood of Carpenters & Joiners of America, AFL–CIO, having learned that K & K, a nonunion organization, paid wages below union scale, began a program of peaceful informational picketing at several locations. These sites included a shopping mall several hundred feet from the main gate to the development, the area behind the shopping center, and the development's main gate. Panther Valley's sales office was located in the shopping mall and prospective customers were taken through the main gate to the housing site. K & K filed a complaint with the Board alleging that Local 399 was violating §§ 8(b)(4)(i)(B) and 8(b)(4)(ii)(B) of the National Labor Relations Act, 29 U.S.C. §§ 158(b)(4)(i)(B), (ii)(B).

After a hearing, an administrative law judge (ALJ) dismissed the § 8(b)(4)(i)(B) charge, but found a violation of § 8(b)(4)(ii)(B). By a divided vote the Board reversed, finding that the picketing was directed at the primary employer and, hence, was protected activity.

During the time of the picketing, access to the construction area was by the main gate and two reserved gates located at the other extreme of the property, two to three miles from the shopping mall. One of the reserved gates was designated for the use of K & K employees and the other was for the other construction trades personnel. The housing areas where K & K was working were about equidistant from the boundaries of the property but were not visible from any of the gates because of the terrain. The two reserved gates were left unattended during the daytime but were secured at night. Neither was ever picketed by Local 399.

Security personnel of Panther Valley controlled the main gate. At times a truck with a K & K decal was seen in the shopping mall and using the main gate. The evidence did not disclose whether construction employees driving in private automobiles used the main gate, or, if so, who their respective employers might have been.

Before the picketing began, Local 399 had written to K & K about its wage standards and the possibility of picketing. The company responded, stating separate reserved gates for K & K and for all other construction workers would be designated and that the main gate would be used by neutral employees as well as others not involved in the primary dispute.

On two dates in November, 1975, and on Saturdays and Sundays in April and June of 1976, pickets appeared at the main gate and the shopping center. Three pickets patrolled the main entrance of the construction site, at the southeastern edge of the property, and two were stationed behind the shopping center, south of the main entrance. On Sunday, April 4, 1976, pickets were also present in the shopping center entrance near the sales office of Panther Valley Ltd. The pickets carried signs reading:

NOTICE
CARPENTERS
LOCAL # 399 PROTESTS
SUBSTANDARD WAGES
AND CONDITIONS
BEING PAID ON THIS JOB BY
*K & K CONSTRUCTION CO., INC.*
CARPENTERS LOCAL # 399
DOES NOT INTEND BY THIS PICKET
LINE TO INDUCE OR ENCOURAGE
THE EMPLOYEES OF ANY EMPLOY-
ER TO ENGAGE IN A STRIKE OR A
CONCERTED REFUSAL TO WORK

The pickets also passed out handbills setting out union pay scales and stating that members were neighbors and taxpayers trying

to protect area wage standards and conditions that took many years to achieve.[1]

The ALJ found that the picketing and handbilling were clearly aimed at prospective purchasers of houses from Panther Valley. In his decision he wrote: "In appealing to a customer and giving him the 'facts' in regard to the work being done by K & K, the only conceivable result which could be sought by the Union is to have Panther Valley prospective customers shy away from buying Panther Valley's products i. e. the houses, because of K & K's part in producing that product." The ALJ also noted that weekend picketing at the main entrance and at the mall where the office was located had as a purpose hindering the sale of Panther Valley's homes, with the illegal objective of having that company terminate its relationship with K & K.

Over a strong dissent, the Board disagreed, stating that area standards picketing by Local 399 was lawful activity directed at the primary, K & K. The dissenting member argued that the Board was departing from established precedent prohibiting secondary picketing where the struck product could not be separated from that of the secondary party.

Resolution of the issue in this case turns upon the interpretation of § 8(b)(4)(ii)(B), which makes it an unfair labor practice "to threaten, coerce, or restrain any person engaged in commerce . . . where . . an object . . . is . . . . (B) forcing or requiring any person to cease using, selling . . . or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person." Congress adopted this amendment to § 8(b)(4) as part of the Labor-Management Reporting and Disclosure Act of 1959, Pub.L. No. 86–257, § 704(a), 73 Stat. 542 (1959), because of a desire to restrict picketing at secondary sites. The amendment was a reaction to dissatisfaction with a growing tendency of labor-management disputes to be carried over to neutral parties as a means of forcing settlements between the principals.

In *NLRB v. Fruits & Vegetable Packers & Warehousemen, Local 760,* 377 U.S. 58, 84 S.Ct. 1063, 12 L.Ed.2d 129 (1964) (*Tree*

---

1. The handbill read as follows:

> "HERE ARE THE FACTS
>
> UNION CARPENTERS IN THIS AREA ENJOY THE FOLLOWING WAGES, BENEFITS:
>
> ON HOMES, WALK–UP APARTMENTS CONDOMINTUMS [sic] AND TOWNHOUSES
>
> Journeymen Rate—$6.25 per hour
> Hospital Insurance—6% of gross wages
> Pension—6% of gross wages
> Apprentice Training—.002% of gross wages
>
> ---
>
> WE ARE PICKETING THE *K & K CONSTRUCTION CO. INC.,* WHICH IS PERFORMING CARPENTRY WORK ON THIS JOBSITE UNDER *NON* AFL–CIO UNION CONDITIONS, WHICH HAVE THE EFFECT OF DESTROYING THE WAGE STRUCTURES, FRINGE BENEFITS AND GOOD WORKING CONDITIONS WHICH HAVE BEEN ESTABLISHED AS AREA STANDARDS FOR THIS TYPE OF WORK PERFORMED IN THIS COUNTY. OUR MEMBERS ARE RESIDENTS AND TAXPAYERS IN THIS COUNTY. THEY ARE YOUR NEIGHBORS. THEY ARE TRYING TO PROTECT THE WAGES AND CONDITIONS WHICH TOOK MANY YEARS TO ACHIEVE.
>
> UNITED BROTHERHOOD OF           CARPENTERS LOCAL UNION
> CARPENTERS, AFL–CIO                             399

The reverse side of the handbill contained a diagram encaptioned "Housing Costs" which stated that on-site labor should represent "16% of your overall cost."

**1232**

*Fruits*), the Supreme Court examined the legislative history of the amendment to § 8(b)(4), emphasizing that "Congress has consistently refused to prohibit peaceful picketing except where it is used as a means to achieve specific ends which experience has shown are undesirable." 377 U.S. at 62, 84 S.Ct. at 1066. Thus, looking for "the clearest indication in the legislative history" to outlaw picketing, the Court, based on its reading, concluded that the provision was not intended to prohibit all consumer picketing at a secondary site: "All that the legislative history shows in the way of an 'isolated evil' believed to require proscription of peaceful consumer picketing at secondary sites was its use to persuade the customers of the secondary employer to cease trading with him in order to force him to cease dealing with, or to put pressure upon, the primary employer." *Id.* at 63, 84 S.Ct. at 1066.

In the *Tree Fruits* case, a labor dispute between a union and certain Washington state fruit packers led to picketing of the Safeway chain of retail stores that sold apples of the struck firms. The pickets confined their efforts to urging a boycott of nonunion Washington apples and were careful to avoid interference with customers of Safeway, making no attempt to extend the boycott request to other products sold by the stores. The Court distinguished between that situation, where there was peaceful picketing directed only at one product of many carried by the secondary's stores, and one in which an appeal was made to customers to refrain from trading altogether with the secondary employer. In the former case, the union's public appeal is confined to its dispute with the primary; in the latter, however, the appeal goes beyond the struck goods as the union seeks by curtailing the public's patronage to force the secondary to cooperate with the

union in its primary dispute. The Court reasoned that under those circumstances, the union created a separate dispute with the secondary employer, an evil sought to be eliminated by the 1959 amendment.

*Tree Fruits* created an exception to § 8(b)(4), one whose limitations must be defined in a variety of circumstances. In that case the secondary employer stocked many items and the easily identifiable struck product was sold in essentially the same form as when obtained from the primary. Quite a different problem is presented when the primary's product or service is merged with the secondary's and the union cannot limit its public appeal for a boycott without enmeshing the neutral in its dispute.[2] Since the consumer cannot separate the struck product from that of the secondary, picketing in those circumstances is tantamount to urging the prospective purchaser not to deal with the secondary employer. At its extreme, if the sole output of the secondary contains the product of the primary, the prospective purchaser may of necessity cease patronizing the secondary altogether.

In *Honolulu Typographical Union No. 37 v. NLRB,* 401 F.2d 952 (D.C. Cir. 1968), the Court of Appeals for the District of Columbia agreed with the Board that *Tree Fruits* was inapplicable where the struck product had become an integral part of the retailer's entire offering, so that the product boycott of necessity encompassed the entire business of the secondary employer. Agreeing with *Honolulu Typographical Union No. 37* that a boycott of the struck product was illegal when the struck product has "so merged into the seller's total business as to be indistinguishable therefrom," 131 U.S.App.D.C. at 5, 401 F.2d at 956, the Court of Appeals for the Sixth Circuit in *American Bread Co. v. NLRB,* 411 F.2d 147

2. *See, e. g., Hoffman v. Cement Masons Local 337,* 468 F.2d 1187 (9th Cir. 1972), *cert. denied,* 411 U.S. 986, 93 S.Ct. 2269, 36 L.Ed.2d 964 (1973); *American Bread Co. v. NLRB,* 411 F.2d 147 (6th Cir. 1969); *Honolulu Typographical Union No. 37 v. NLRB,* 131 U.S.App.D.C. 1, 401 F.2d 952 (D.C. Cir.1968); *NLRB v. Local 254, Bldg. Serv. Employees Int'l Union,* 376 F.2d 131 (1st Cir. 1967); *NLRB v. Building Serv. Employees Local 105,* 367 F.2d 227 (10th Cir. 1966); *NLRB v. Millmen Union Local No. 550,* 367 F.2d 953 (9th Cir. 1966); *NLRB v. Local 254, Bldg. Serv. Employees Int'l Union,* 359 F.2d 289 (1st Cir. 1966), *cert. denied,* 389 U.S. 856, 88 S.Ct. 86, 19 L.Ed.2d 123 (1967).

(6th Cir. 1969), held it was illegal to picket a restaurant that used bread purchased from a company with which the union had a dispute. And in *Hoffman v. Cement Masons Union Local 337*, 468 F.2d 1187 (9th Cir. 1972), *cert. denied*, 411 U.S. 986, 93 S.Ct. 2269, 36 L.Ed.2d 964 (1973), the Ninth Circuit found the *Tree Fruits* exception inapplicable in a construction industry context similar to the case *sub judice*. In that case, the Board found that a mason's union had violated the Act by picketing the only entrance to a housing subdivision and urging prospective customers not to purchase homes. The union dispute was with a contractor who it was alleged failed to observe area standards in compensating employees. The court of appeals, pointing out that there was only a single product—the homes—that was affected by the picketing, observed:

> "There is a great difference in impact when the public is asked to be selective among products once inside the secondary's premises, *Tree Fruit, supra,* and in asking them to completely refuse to enter, or to cease all dealings with the secondary. . . .
> ". . . [T]he broad suggestion that [the contractor's] products not be purchased still necessarily encompassed the entire business of . . . the neutral secondary. This is an unlawful end under the Act." 468 F.2d at 1192.

The Board in the foregoing cases consistently interpreted *Tree Fruits* as not controlling where because of the merged product the union's picketing had the effect of advocating a complete boycott of the secondary. In this case, however, the Board has shifted its stance. Noting that the union had a bona fide area standards disagreement and had couched its picket signs in language expressly informing the public that its dispute was with the primary only,[3] the Board majority did not agree that the picketing violated the Act. In its decision, the majority stated:

> "Specifically, we are disturbed by the proposition that the mere publicizing of an otherwise lawful area standards dispute is necessarily an appeal for a consumer boycott and the corollary proposition that in the construction industry such a boycott is necessarily illegal under the merged product doctrine."

The Board appeared to be concerned that in light of the special circumstances of the construction industry, the merged product doctrine would be applicable in almost all instances, thus depriving construction unions of an opportunity available to others to inform the public of their disputes.

In the field of labor-management relations, the construction industry has in fact received special treatment from Congress whenever it was thought to be appropriate.[4] The lack of any specific exemption from the secondary picketing prohibition, therefore, is significant and indicates to us that Congress intended to include construction unions in the 1959 amendment's picketing proscription. We find this interpretation to be consistent with decisional law of the last

---

**3.** In our view, the Board in the case *sub judice* placed undue emphasis on the wording of the picket signs. It has been held that the wording on the sign being carried by a picket is not determinative of the lawfulness of the conduct and even if there is no mention of a boycott, there may be unlawful secondary picketing. *See NLRB v. Local 307, Plumbers United Ass'n of Journeymen*, 469 F.2d 403 (7th Cir. 1972); *NLRB v. Millmen Union Local 550, supra.* The test is not the text of the signs but the objective of the picketing.

The Board, moreover, ignored pertinent findings of the ALJ that "[w]eekends are generally the time that people go househunting" and that "[p]icketing at the main entrance to Panther Valley and at the Panther Valley Mall where the sales office is located . . . must have as one purpose, hindering Panther Valley's sales of its homes." We are persuaded in this case that the timing and location of the picketing reveal an objective unlawful under § 8(b)(4)(ii)(B).

**4.** *See, e. g.,* § 8(f) of the Act, 29 U.S.C. § 158(f), also one of the 1959 amendments, which acts as a savings clause, permitting the execution of prehire agreements in the building and construction industry which would otherwise constitute unfair labor practices; and the construction industry proviso in § 8(e), 29 U.S.C. § 158(e), limited to the work site, exempting unions and employers in that industry from the bar of "hot cargo" agreements.

twenty years. If a change is now to be made, it should be effected by Congress, not this court or the Board.

It is true that in a sense the case law interpreting *Tree Fruits* gives broader immunity to those secondary sellers who retail struck primary products that are so merged in their total business as to be indistinguishable. But, as the D.C. Circuit observed in *Honolulu Typographical Union No. 37 v. NLRB, supra* 131 U.S.App.D.C. at 5, 401 F.2d at 956:

"The short answer, however, is that the law makes distinctions in terms of the tradition and economic realities of Union pressure, even though this may result in differences not easily subject to logical delineation between the scope and kinds of picketing available to unions in different circumstances.

"Here, where picketing means a total boycott, one interest must plainly yield . . . . In the 1959 amendments, Congress chose protection of the neutral from this sort of disruption as the interest more deserving of protection."

■ The distinction between primary and secondary activity is not always easy to delineate but we have no difficulty in determining that the union's picketing here was in violation of the statute.[5] The Board's dismissal of the K & K complaint was an unwarranted extension of *Tree Fruits* that in effect would allow the exception it represents to swallow the statute itself.

■ Moreover, this case does not rest upon "mere publicizing" of an area standards dispute, as the Board characterized the union's activity. It is picketing, not mere publicizing, which is the basis of the unfair labor practice charged here. Had the Local chosen to utilize only handbilling or other advertising to publicize its dispute, there would have been no violation of the Act under the publicity proviso of § 8(b)(4).[6] *See Tree Fruits, supra*; *NLRB v. Servette, Inc.,* 377 U.S. 46, 54–57, 84 S.Ct. 1098, 1103–05, 12 L.Ed.2d 121 (1964). Picketing consists of more than mere publicizing; it includes patrolling as well. Although the message may be protected, the patrolling may be regulated. *See International Brotherhood of Teamsters, Local 695 v. Vogt, Inc.,* 354 U.S. 284, 77 S.Ct. 1166, 1 L.Ed.2d 1347 (1957); *Hughes v. Superior Court,* 339 U.S. 460, 70 S.Ct. 718, 94 L.Ed. 985 (1950); *Giboney v. Empire Storage & Ice Co.,* 336 U.S. 490, 69 S.Ct. 684, 93 L.Ed. 834 (1949). Thus, our conclusion that picketing under the circumstances here is prohibited under § 8(b)(4)(ii)(B) does not collide with the First Amendment. "Read as barring only picketing urging total consumer boycott, . . . the statute strikes narrowly at those 'inherently compulsive features' present when consumers must cross a line." *Honolulu Typographical Union No. 37 v. NLRB, supra* 131 U.S.App.D.C. at 6 n.11, 401 F.2d at 957 n.11.

Accordingly, the order of the Board dismissing the complaint will be set aside and

---

5. This case differs from the situation where activity characterized as area standards picketing is raised as a defense to a charge under § 8(b)(7)(C), 29 U.S.C. § 158(b)(7)(C). In *NLRB v. Building & Constr. Trades Council,* 578 F.2d 55 (3d Cir. 1978), it was contended that primary picketing purportedly protesting violations of area standards did not require the union to petition for an election. That defense, which may have application to a § 8(b)(7)(C) charge, however, does not immunize the union from a finding of illegal secondary picketing under § 8(b)(4)(ii)(B).

6. For a discussion of picketing as signalling a labor dispute, in contrast with other forms of publicity, such as handbilling, *see* Engel, Secondary Consumer Picketing, 52 Va.L.Rev. 189, 210 n.76 (1966). Traditionally, the public associates picketing with a labor dispute. Com-

ment, Product Picketing—A New Loophole in Section 8(b)(4) of the National Labor Relations Act?, 63 Mich.L.Rev. 682, 691–92 (1965). Thus picketing, because it instantly signals a labor dispute, is likely to signal the public that the employer being picketed is unfair to labor. Handbilling and other forms of publicity, on the other hand, are not likely to have the signal aspect of labeling the neutral as unfair. *Id.* at 697–99. Moreover, handbilling and other informational devices are better adapted at truthfully advising the public. Comment, Picketing and Publicity Under Section 8(b)(4) of the LMRA, 73 Yale L.J. 1265, 1280–82 (1964). *See* Comment, Secondary Consumer Picketing: Some Grafts on *Tree Fruits,* 44 Tul.L.Rev. 537, 538 n.7 (1970); Comment, Secondary Consumer Picketing, 19 Sw.L.J. 567, 580 (1965).

the matter remanded for further proceedings consistent with this opinion.